## THE TRANSFER NO. 22.

### (District Court, E. D. New York. March 30, 1916.)

COLLISION ☞71(2)—LANDING OF CAR FLOATS AT TERMINAL—DUTY AND LIA-
BILITY OF TUG.

 A transfer tug, which attempted to land two car floats at the same
time in the night at the terminal bridges of a railroad company at Jer-
sey City, *held* in fault and liable for an injury caused by one of the
floats to another already moored, in the absence of evidence which estab-
lished an agreement or custom which made it the duty of the railroad
employés or those in charge of moored floats to attend to the landing of
approaching floats and to look after the safety of those already moored,
further than to do what they could to prevent an injury which seemed
impending.

 [Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig.
☞71(2).]

In Admiralty. Suit by the Lehigh Valley Transportation Company
against the steam tug Transfer No. 22, the New York, New Haven
& Hartford Railroad Company, claimant, with the Lehigh Valley Rail-
road Company impleaded. Decree for libelant, against the Transfer
No. 22.

Harrington, Bigham & Englar, of New York City (T. C. Jones, of
New York City, of counsel), for libelant.

Charles M. Sheafe, Jr., of New York City, for claimant.

B. F. La Rue, of New York City (T. C. Jones, of New York City,
of counsel), for respondent.

CHATFIELD, District Judge. On the morning of February 15,
1915, Transfer No. 22, of the New York, New Haven & Hartford
Railroad, received a signal to put two car floats loaded with freight
cars which it had in tow into bridges 5 and 6, at the Lehigh Valley
Terminal in Jersey · City. The Transfer was between the two floats
and went ahead in what is testified to be the customary manner, so
as to divide the float upon her port hand from the one upon her star-
board hand by the center pin or rack between the two bridges.

The tide was running strongly ebb and the intention of the captain
of the Transfer was to move the float upon his starboard hand in
toward bridge No. 6, to a point where the bow of the float would come
against the upper or northern rack of bridge No. 6, while the port
side of the float would rest against the center pin. By running out
lines, this float could be maintained in that position while the tug took
the other float into bridge No. 5 and had it secured in place.

The maneuver occurred at 1:35 a. m., and according to the testi-
mony not many of the force of railroad men were on duty, as it was
Monday morning and the force had been small during the evening of
Sunday, February 14th. But this makes no difference, as men were
present to perform all of the duties which the railroad company under-
took and which it claims that it was liable to attend to.

In bridge No. 4 a float belonging to the Lehigh Valley Transpor-
tation Company was moored. There had been a floatman upon this

float, but at this precise moment he had gone to the railroad office upon the pier.

The floats are moored to the bridges by two lines, one at each side of the bow, and by four toggle pins, which pass into sockets, or rings so as to exactly register the up and down position of the boat and to cause exact meeting of the track rails when the boat is held firmly to the dock by tightening the side lines.

No great amount of side motion is possible at the outer end of the car float, unless one of these side lines be loosened and the boat withdrawn from the toggle pins. But in order to hold the float securely in her position, a breastline is run out to the rack on each side, and the testimony shows that on occasion these breastlines are loosened or eased up, if another boat comes in contact with the float moored to the bridge. This is done with the double purpose of easing the blow and also preventing the breaking of the line, and it appears from the testimony that considerable dispute has arisen between the car floats and the Lehigh Valley Railroad Company as to responsibility for broken lines under such circumstances.

The Lehigh Valley Railroad Company disavows liability for such broken lines and for the safety of the floats, when properly moored, in case of injury by other vessels being brought into or warped into the terminal.

In this case the libelant has brought its action against the tug, which upon invitation and by business arrangement with the Lehigh Valley Railroad Company was bringing a car float to the Lehigh Valley Railroad terminal, in order to continue the transfer of the freight cars upon the float, over the Lehigh Valley Railroad.

The New York, New Haven & Hartford Railroad Company as owners of this tug have brought in the Lehigh Valley Railroad Company as a defendant, and the issue comes down substantially to a question of responsibility between the two railroad companies, as the New York, New Haven & Hartford Railroad Company offers testimony seeking to show a custom on the part of the Lehigh Valley Railroad Company to send men to ease off the lines or to care for the floats in the terminal, when other floats are being brought in on an ebb tide.

The Lehigh Valley Railroad Company not only denies the existence of any such custom, but stands upon the broad proposition that it owed no duty of that sort to either the float already moored or to the tug and float coming into the terminal, and that the obligation to so maneuver the moving boats as not to injure those already in place rests upon the moving boat. In other words, if the float already moored (or the railroad) sees that another boat is coming in contact and eases off a line to prevent breaking of the line or force of the blow, the Lehigh Valley Railroad Company contends that this is not an admission of responsibility or obligation to provide some one to perform such a service, but that it is rather the usual obligation resting upon any person to avert injury to property in any way under the control or care of the person when impending injury is brought to that person's attention. The Express, 212 Fed. 672, 129 C. C. A. 208; The Jersey Central, 221 Fed. 625, 137 C. C. A. 349.

No substantial difference arises in the present case because of the ownership by the Lehigh Valley Transportation Company of the float in bridge No. 4, from that which would be presented if this float had been the property of the Lehigh Valley Railroad. If the New York, New Haven & Hartford tug can rely upon a duty, of either the float-man upon the float or the railroad employés at the bridges, to pay attention to the whistle announcing the arrival of the tug, and to man the various lines of the float in the bridge, so as to assist the New Haven tug in bringing its floats into place, and to prevent injury to the floats already moored, then the New Haven tug is not responsible for such injuries as might result from lack of care on the part of the men protecting the moored boat, and would be bound only to handle the moving floats so as to create no negligent or unusual risk.

If an established custom to perform this service of looking out for the moored boats was established on the part of the railroad company, then the railroad company maintaining the terminal would of course be liable to the boats in the bridges for broken lines, etc. Similarly, the existence of such a custom, if that custom went to the extent of requiring the boat moored to the bridges to maintain a watchman to attend to its own lines, would absolve the railroad company maintaining the terminal, and the loss would fall upon the boat which was injured.

But if the obligation resting upon the tug in charge of the moving boats requires it to so navigate as to use reasonable precautions in avoiding danger, under the conditions which must be taken into account at the time, to vessels which are moored at the time, then all that the moving vessel can expect from either the men at the terminal or upon the moored float is to do whatever may be in their power to prevent an avoidable injury, if such an injury is impending, or to give warning of danger, if the dangerous condition is not apparent to the moving vessel.

This would not absolve the moving vessel from the necessity of so navigating as to avoid inflicting injury upon the moored vessel, in case no one happens to be at the precise point where his services might be of some assistance in making the maneuver easier for the moving vessel. Nor would the moving vessel have the right to depend upon the observance and help of the employés of the railroad at the terminal, in accomplishing that which the tug undertakes to do.

The signal from the terminal, that the boat may be brought in, and the indication as to what bridge is to be used, and the preparation of the terminal only go so far as to require removal of such obstacles or conditions as would prevent the free and proper use of the bridges by the tug which is handling the floats which are to be brought in.

In the absence of express agreement or of custom which would indicate that the railroad company operating the terminal actually attended to the moving, landing, and mooring of the floats, and that the tug became merely the agent of the terminal company in so doing, it is impossible to shift the responsibility for the natural and probable results of what the tug undertakes, either to the helpless float already

in the terminal, or to the railroad company, which stands ready to receive the boat which the tug is bringing in.

According to the testimony in this case, at the terminal in question, upon an ebb tide, it is substantially impossible to put two floats into the upper (Nos. 5 and 6) bridges at the same time, without causing the lower of these floats to come in contact with the float in the bridge below.

Inconvenience in taking the floats in one at a time is the alternative, but if, in order to save this time, the tug attempts to land the two floats at once without injury, and if it is not so fortunate as to receive help from some other person by which consequences of danger may be avoided, it cannot escape liability by suggesting that it expected or hoped for the help which it did not receive, and that it should not be blamed, inasmuch as in most instances the help might have been obtained.

The libelant may have a decree against the Transfer No. 22, and the petition to bring in the Lehigh Valley Railroad Company should be dismissed.